***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has shown good grounds to reconsider the evidence; therefore, the Full Commission REVERSES the decision of the Deputy Commission and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and the subject matter of this action.
2. All parties have been correctly designated, and that there is no question as to misjoinder or nonjoinder of parties.
3. On or about May 20, 1998 and October 10, 1999, the defendant-employer employed more than three employees, and it and its employees were bound by and subject to the provisions of the North Carolina Workers' Compensation Act, N.C.G.S. Chapter 97.
4. On or about May 20, 1998 and October 10, 1999, there existed between the plaintiff and defendant-employer an employee/employer relationship.
5. On or about May 20, 1998 and October 10, 1999 employer provided Workers' Compensation Insurance coverage to its employees through American Protective Insurance Company.
6. On or about May 20, 1998, plaintiff was employed by the employer at an average weekly wage of $319.76 and that on or about October 10, 1999, plaintiff was employed by the employer at an average weekly wage that will be determined by a North Carolina Industrial Commission Form 22. (No additional Form 22 was submitted).
7. On or about May 20, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer, with injury to the back and right leg and on October 10, 1999 plaintiff alleges that she sustained an occupational disease due to products that were stored and sold in the employer's place of business.
8. The plaintiff has been paid temporary total disability benefits as a result of her injury by accident on May 20, 1998; plaintiff has not received any temporary partial, permanent total, or permanent partial disability benefits as a result of her alleged occupational disease that she sustained on October 10, 1999.
9. Documents stipulated into evidence include the following:
a) Plaintiff's Exhibit #1 Plaintiff's medical records
 b) Defendant's #2 Miscellaneous medical records of the plaintiff
10. The depositions of Joseph Bloem, M.D., David Browder, M.D., Eric Brestel, M.D., Allan Leiberman, M.D., William J. Meggs, M.D., and Judith Yongue, M.D. are a part of the evidentiary record in this case.
 ***********
Based on the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing in this matter, plaintiff was thirty-one (31) years old. Plaintiff began working with defendant-employer, Tractor Supply Company, in or about August 1992. Plaintiff last worked for Tractor Supply Company on October 8, 1999 and was employed in the Rocky Mount, North Carolina store at that time.
2. On May 20, 1998, plaintiff sustained an admittedly compensable injury by accident causing injury to her back and right leg, particularly her right knee. On this date, plaintiff encountered two people attempting to steal go-karts from the premises. Plaintiff was knocked down and injured as she attempted to stop them.
3. Plaintiff underwent an arthroscopy and a partial left meniscectomy in September 1998 performed by Dr. Greg McAvoy as a result of her compensable right knee injury. Plaintiff thereafter participated in physical therapy and continues to experience problems with her right knee. Dr. McAvoy ultimately found plaintiff to be at maximum medical improvement and released her with a five percent (5%) permanent partial disability rating for her right leg.
4. On February 8, 1999, plaintiff reported to Dr. Josephus Bloem for a second opinion regarding her right knee. During this initial visit, Dr. Bloem determined that plaintiff had wounds that were healing well from her prior knee surgery. Dr. Bloem also noted that plaintiff had marked atrophy of the muscles above the knee. Dr. Bloem also assigned plaintiff's right leg a five percent (5%) permanent partial impairment rating.
5. Subsequent to the February 8, 1999 visit, plaintiff saw Dr. Bloem many times for continuing problems with her right knee. Plaintiff's right knee problems included swelling, popping, and giving way. An MRI of plaintiff's right knee was performed on February 16, 1999. According to Dr. Bloem, plaintiff is in need of additional surgery, namely a diagnostic arthroscopy.
6. As a result of plaintiff's May 20, 1998 admittedly compensable injury by accident, plaintiff sustained a five percent (5%) permanent partial disability to her right leg and requires surgery to further treat the resultant right knee condition.
7. In addition to the knee injury, plaintiff began experiencing a significant increase in headaches, sinusitis, and bronchitis during the fall of 1998. During this time, plaintiff's job duties included working around and assisting in the stocking of a number of products at work, including several chemicals. Plaintiff sought medical treatment for these problems, and at that time the medical providers believed plaintiff's problems were hormonal.
8. On September 16, 1999 eastern North Carolina, including Rocky Mount and the surrounding area, experienced significant flooding as a result of Hurricane Floyd. Plaintiff only worked one day between this time and her wedding date, September 25, 1999. Plaintiff returned to work at Tractor Supply after her honeymoon on October 8, 1999.
9. As a result of the flooding, the Rocky Mount store of Tractor Supply Company made a business decision to begin carrying a product called Snake-A-Way. The product had not been carried in the store since at least 1998 when the new store manager, Guy Reed, began employment with defendant-employer.
10. Snake-A-Way is a product containing naphthalene and comes in plastic-like containers. Approximately twenty to twenty-five cases of the product were received in the Rocky Mount store in early October. Originally the display was set at the front of the store near the entrance and front counters. However, after several employees complained of a strong odor, the display was moved to a location in the store in very close proximity to plaintiff's work area which plaintiff noticed immediately upon her arrival at work on October 8, 1999.
11. On October 9, 1999, plaintiff experienced severe urticaria (or hives). Plaintiff sought medical treatment from Nash General Emergency Room several times within a twenty-four hour period and was ultimately hospitalized on October 11, 1999 after her fourth visit to the emergency room as a result of the severity of her urticaria.
12. Upon her release from the hospital, plaintiff visited Dr. Valerie Laing, an allergist with the Boyce-Willis Clinic where plaintiff's regular family physician, Dr. David Browder, also practices. Dr. Laing acknowledged that plaintiff still had remnants of the urticaria and offered a change in medication.
13. Dr. Browder, plaintiff's family physician who is board-certified in internal medicine, continued to follow-up with plaintiff on a regular basis following her hospitalization. Plaintiff reported to Dr. Browder experiencing anxiety and depressive symptoms following the episode at work on October 8, 1999. After administering a geriatric depression scale, Dr. Browder diagnosed plaintiff with major depression and prescribed medication for the same. Plaintiff indicated to Dr. Browder that her symptoms were related to the severe urticaria she was experiencing and stress from work.
14. Upon referral from a friend, plaintiff sought treatment of her own volition from Dr. Eric Brestel with Allergy East in Greenville, North Carolina on October 12, 1999. Dr. Brestel is board certified in internal medicine and completed a fellowship in allergy and clinical allergy. Dr. Brestel primarily treats patients with allergy, asthma and various skin conditions. At the time of plaintiff's visit with Dr. Brestel, plaintiff was diagnosed with urticaria, cervical facet dysfunction, and migraine headaches. Plaintiff has a history of migraine headaches. Dr. Brestel indicated in his medical notes of October 12, 1999 that the urticaria was likely due to components found in the Snake-A-Way product to which plaintiff had been exposed on October 8, 1999. Plaintiff was taken out of work for seven days.
15. Plaintiff again presented to Dr. Brestel's office on October 13, 1999 again with urticaria and angioedema. Plaintiff was administered epinephrine, and she and her husband were taught how to administer the injections themselves.
16. As of October 18, 1999, plaintiff was released to return to work upon the condition that the Snake-A-Way be moved to the furthest point in the store away from plaintiff's work area and that it be covered with plastic. However, corporate officials considered moving the Snake-A-Way product and covering it with plastic detrimental to its sales potential and refused to do so. As a result, plaintiff was unable to return to work for defendant-employer.
17. During her treatment with Dr. Brestel even while not working at defendant-employer, plaintiff continued to suffer allergic episodic events of an unexpected nature. These events would trigger urticaria and other symptoms causing plaintiff to drastically change her lifestyle.
18. On March 3 and 4, 2000 plaintiff was exposed to the odor of mothballs, which triggered an episode of urticaria which required her to seek medical treatment. On May 23, 2000, plaintiff was exposed to "Prowl", an agricultural product that contains naphthalene. The odor of the product entered through the air conditioning system of the vehicle in which plaintiff was riding, causing her to break out in hives. Dr. Brestel treated plaintiff for this episode.
19. In June 2000, plaintiff attempted to return to work for an after school program with Edgecombe County Schools. Plaintiff experienced hives and shortness of breath within one hour of arriving at her new job at Carver School due to the close proximity of her working area to the janitorial chemical room. Plaintiff was then transferred to Bullock School where she experienced an adverse reaction to mothballs and sulphur sprinkled on the school premises to ward away snakes. After this incident, plaintiff discontinued working for Edgecombe County schools.
20. Later in the summer of 2000, plaintiff attempted to return to work at Riverside Veterinary Hospital as a kennel assistant. On September 13, 2000 after plaintiff had shampooed dogs and given flea dip treatments, plaintiff experienced a severe reaction that required her to administer herself an injection of epinephrine. The shampoo plaintiff used contained pyrethrins, a form of pesticide. Plaintiff was unable to continue employment in the veterinary environment. Plaintiff had completed approximately three weeks of employment with Riverside Veterinary Hospital.
21. Plaintiff underwent further allergy tests and was found to have no known food allergies nor any autoimmune diseases.
22. Dr. Brestel continued to treat plaintiff for periodic episodes of urticaria, triggered by various and unsuspecting events or exposures, including September 28, 2000, when plaintiff was treated after having changed laundry detergents. At the time of plaintiff's last visit with Dr. Brestel on April 3, 2001, plaintiff was rarely having episodes of urticaria, however, she remained under Dr. Brestel's care.
23. Dr. Allan Lieberman who is board certified in environmental medicine evaluated plaintiff on October 25, 2000, at which time he concluded that plaintiff was exposed to naphthalene by way of the Snake-A-Way product plaintiff encountered at work with the defendant-employer. As a result of the exposure, plaintiff had acute reactions within eight hours, followed by angioedema (swelling of her body) in association with urticaria.
24. In the years prior to October 8, 1999, plaintiff experienced a myriad of reactions to various substances. Plaintiff's medical records indicate she has had long-standing allergic reactions to diesel fuel, gasoline, "prowl", a chemical pesticide used on rural farmland in plaintiff's community, cigarette smoke, perfume and other substances. In the one year prior to October 8, 1999, plaintiff received extensive medical treatment for migraine headaches including treatment at Cedar Healthcare in Raleigh and Boice Willis Clinic in Rocky Mount. Plaintiff also complained of continuous and consistent migraine headaches prior to October 8, 1999 to family physician Dr. David Browder.
25. Plaintiff also treated with Dr. Browder for depression prior to her alleged Snake-A-Way exposure on October 8, 1999. On August 11, 1999, plaintiff presented to Dr. Browder with migraine headache complaints and said she was incurring increased stressors recently including serious family problems and stressful factors in her life.
26. Although Dr. Lieberman characterized plaintiff's condition as "Naphthalene Toxicity Syndrome", his main basis for doing so was the temporal relationship between plaintiff's exposure history and the onset of her condition. Even though naphthalene is capable of producing such symptoms, plaintiff was continuing to experience these same symptoms long after the date of her initial exposure. Dr. Lieberman made the following statement below regarding plaintiff's personal sensitivities:
 "She can be exposed to what you and I would not even pay attention to. The problem is, once a patient develops chemical sensitivity, whereas you and I are aware of the presence of chemicals in parts per million, these patients are aware of the presence of a chemical in parts per billion. That is a very big difference in terms of sensibility. By definition, that is the division, is that they're much more reactive at levels the normal population wouldn't react."
Dr. Lieberman further indicated that in this petrochemical world, plaintiff is extremely handicapped vocationally because of her ultra-sensitivity to exposures to various agents and chemicals.
27. Upon referral from Dr. Brestel to whom plaintiff had previously referred herself, plaintiff presented to Dr. William Meggs on June 24, 2001. Dr. Meggs is board certified in allergy and clinical immunology and medical toxicology. Dr. Meggs found that plaintiff had some chronic low level exposure to agricultural chemicals at work producing some chronic respiratory problems. As a result of this visit, Dr. Meggs provided plaintiff with epinephrine and encouraged her to avoid respiratory irritants. Dr. Meggs testified in his deposition that plaintiff did not have an increased susceptibility to naphthalene, but instead had a hyperactivity to respiratory irritants.
28. In 1996, the World Health Organization (WHO) issued a report stating that multiple chemical sensitivity (MCS) cannot be recognized as a clinically defined disease because the relationship between symptoms and exposure has not been proven. In Mary Deaton v. Wal-Mart, Inc., I.C. File No. 224509 (2002) and in James W. Duncan v. Tyson Foods, Inc., I.C. File No. 335392, (1997), the Full Commission found that MCS was not accepted by the majority of the competent medical community as a recognized diagnosis for an injury or disease citing the conclusions of Dr. Victor Roth and Dr. Robert H. Barth. Drs. Barth and Roth agreed that most research on what has been called MCS reveals that the patient has a somatoform disorder which is a mental illness that presents with physical symptoms.
29. Although Dr. Brestel bases his causation opinion regarding plaintiff's present condition solely upon the temporal relationship between plaintiff's alleged exposure to Snake-A-Way and subsequent urticaria breakout, he conceded in his deposition that plaintiff's condition was due to her personal sensitivities testifying that plaintiff's urticaria reaction following exposure to naphthalene was due to her peculiar susceptibility.
30. Dr. Brestel, Dr. Lieberman, and Dr. Meggs all testified that plaintiff's present condition is a result of her personal chemical sensitivities. The greater weight of the evidence as enunciated in these three physicians' opinions indicates that plaintiff's condition is not due to causes and conditions characteristic of and peculiar to her job with defendant-employer on the alleged date of exposure; thus, the requisite causal connection between plaintiff's personal chemical sensitivities and her job with defendant-employer necessary to find plaintiff has suffered a compensable occupational disease has not been established.
31. Plaintiff's condition is related to a personal sensitivity to chemical exposure and is caused by exposure to a myriad of chemicals which the general public is exposed to every day. Plaintiff's condition is not due to causes and conditions characteristic and peculiar to her employment. As such, there is no recognizable link between plaintiff's employment and an increased risk of contracting her condition. Plaintiff's employment did not expose her to an increased risk of developing her current condition.
32. Defendants have filed a motion to add additional parties on the basis that plaintiff suffered last injurious exposures either during plaintiff's employment with Edgecombe County Schools or with the veterinarian's office when plaintiff came into contact with flea dip/shampoo.
 ***********
Based upon the Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on May 20, 1998, resulting in injury to her right knee. As a result of said injury by accident, plaintiff sustained a five percent (5%) permanent partial disability to her right leg. N.C.G.S. §§ 97-2(6), 97-31.
2. For her five percent (5%) permanent partial disability of the right leg, plaintiff is entitled to payment of permanent partial disability compensation at the rate of $213.28 per week for ten weeks. N.C.G.S. § 97-31.
3. As a result of plaintiff's admittedly compensable injury by accident of May 20, 1998 and the resultant knee injury, plaintiff requires surgery and is entitled to payment of the same by defendants. N.C.G.S. § 97-25.
4. In order for plaintiff to establish that she has an occupational disease, she must satisfy three conditions: (1) the disease must be characteristic of persons engaged in a particular trade or occupation in which the plaintiff is engaged; (2) the disease must not be an ordinary disease of life to which the public is equally exposed; and (3) there must be a causal connection between the disease and the plaintiff's employment. Jarvis v. Food Lion, Inc., 134 N.C. App. 363, 517 S.E.2d 388, (1999).
5. Plaintiff bears the burden of proving each and every element of his claim under N.C.G.S. 97-53(13). Moore v. J.P. Stevens Co.,47 N.C. App. 744, 269 S.E.2d 159, disc. rev. denied, 301 N.C. 401,274 S.E.2d 226 (1980).
6. "To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. Thus, the first two elements are satisfied, if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation." Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189
(1979). As the greater weight of the evidence demonstrates that plaintiff's present condition is a result of personal sensitivities and peculiar susceptibilities to common chemical exposure levels that are not shared by the general public, plaintiff has failed to prove that her employment with defendant-employer placed her at an increased risk of contracting her present condition. Thus, plaintiff is unable to satisfy the first two elements necessary to establish an occupational disease pursuant to N.C.G.S. § 97-53(13). Futrell v. Resinall Corp.,151 N.C. App. 456, 566 S.E. 181 (2002), review on additional issues allowed, 356 N.C. 300, 570 S.E.2d 505, reconsideration denied,356 N.C. 435, 572 S.E.2d 158 (2002), Hobbs v. Clean Control Corporation,154 N.C. App. 433, 571 S.E.2d 860 (2002).
7. "Due to the complexities of medical science, particularly with respect to diagnosis, methodology and determinations of causation, this court has held that `where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury.'" Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912, 915 (2000), emphasis added, quoting Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "However, when such expert testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman's opinion. As such, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation. Indeed this court has specifically held that `an expert is not competent to testify as to causal relation which rests upon mere speculation or possibility.'" Id.
8. Post hoc ergo propter hoc, or after this because of this, is not competent evidence of causation. Young v. Hickory Business Furniture,353 N.C. 227, 538 S.E.2d 912 (2000). Dr. Brestel, Dr. Lieberman, and Dr. Meggs all agree that plaintiff's condition is a result of her personal chemical sensitivities. Only Dr. Brestel has also opined that plaintiff's condition is related to her job; however, as Dr. Brestel's causation opinion is based solely upon the temporal relationship between plaintiff's alleged exposure to Snake-A-Way and her subsequent urticaria breakout, it is insufficient expert medical opinion evidence to make a finding of a causal connection necessary to conclude plaintiff has suffered a compensable occupational disease.
9. Utilizing the same standard of review as the North Carolina Court of Appeals in the similar case of Nix v. Collins Aikman Co.,151 N.C. App. 438, 566 S.E.2d 176 (2002), the expert medical opinions of plaintiff's physicians fail to prove that plaintiff has contracted an occupational disease caused by and related to conditions characteristic of and peculiar to plaintiff's employment with defendant-employer. N.C. Gen. Stat. § 97-53(13).
10. As plaintiff has failed to prove a claim for occupational disease, defendants' motion to add additional parties is now moot.
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to a reasonable attorney's fee, defendants shall pay to plaintiff permanent partial disability compensation at the rate of $213.28 per week for 10 weeks for the five percent (5%) permanent partial disability to her right leg. Said amount shall be paid in one lump sum.
2. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury by accident of May 20, 1998, including plaintiff's right knee surgery when bills for the same have been submitted and approved by the Industrial Commission, pursuant to proper Industrial Commission procedure.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in Paragraph 1 of this AWARD is approved for plaintiff's counsel
4. Defendants' motion to add additional parties is now moot and therefore DENIED.
This the ___ day of July 2003.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER