***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the parties.
3. Defendant is self-insured and Key Risk Management Services, Inc. is the Third-Party Administrator.
4. Plaintiff's average weekly wage is $458.34, yielding a compensation rate of $305.53 per week.
5. Plaintiff's claim is for an alleged occupational disease arising out of and in the course of her employment. Defendant has denied that plaintiff's claim is compensable.
6. The following documents were stipulated into evidence at the hearing before the Deputy Commissioner: Pre-Trial Agreement, OSHA Compliance Certificate, I.C. forms, medical records, and inspection reports.
7. New Hanover Regional Medical Center medical records for December 2003 were admitted into the record by agreement of the parties subsequent to the Deputy Commissioner's hearing.
8. The issues before the Commission are whether plaintiff sustained a compensable occupational disease, and, if so, what benefits she is entitled to receive.
9. The depositions of Ritchie Shoemaker, M.D., Daniel Tesfaye, M.D., and Paul A. Buongiorno, M.D. are a part of the record.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 45 years old at the time of the Deputy Commissioner's hearing and has a high school education. Plaintiff also attended college for a year and received a Certificate in Health and Medicine. Plaintiff has a varied work history, including work as a drug store sales clerk, assembly line worker, legal secretary in a law office, and disposition clerk at the New Hanover County Courthouse.
2. Plaintiff began working as a deputy clerk in the Office of the Clerk of Superior Court of New Hanover County in December 1997. Brenda A. Tucker, the Clerk of Superior Court for New Hanover County, hired plaintiff. The Clerk's office is part of the Administrative Office of the Courts. Plaintiff worked in the criminal division of the Clerk's office, in the basement of the courthouse, which is also referred to as the first floor.
3. Plaintiff's job duties were to enter judgments from the court and serve as a backup cashier. If a file needed to be retrieved, she pulled it from the vault, which was a different room. On an average day, plaintiff spent between two and three hours in the vault area. She also traveled to the second floor civil Clerk's office for lunch, deliveries, and to make the mail run. In addition, plaintiff went to various courtrooms in the courthouse as part of her work duties. Plaintiff alleges that during her employment, she was exposed primarily to mold, but also to carbon monoxide, and a chemical called Supco-88.
4. The New Hanover County Courthouse was susceptible to water infiltration, particularly during heavy rains and hurricane conditions. Water entered and flooded the basement floor, and there were water stains on the walls and ceiling tiles. After a hard rain, the basement carpet was wet. Mold and mildew were also visible on some of the walls and around windows. Plaintiff felt tired with stuffy congestion when she was in the courthouse, which smelled musty and wet to her. Sometimes, the county brought in workers with machines to vacuum water from the carpet.
5. Plaintiff's testimony about visible conditions in the courthouse was supported by the testimony of co-workers Sharon Lee and Teresa Pugh-McQueen, who were also deputy clerks. Ms. Lee testified that after a hard rain, the water came in from outside the building and flooded the basement, that there were visible water marks and mold, and that she noticed a pungent smell. Ms. Lee also stated that she had some health problems that she felt might be associated with working in the courthouse, but she also admitted that she was a "diehard smoker" since the age of 12.
6. Ms. Pugh-McQueen worked as a deputy clerk in the child support division of the Administrative Office of the Courts, next to plaintiff's office. Ms. Pugh-McQueen testified that there were water stains on the walls and ceiling tiles and black-speckled particles on some of the walls. Ms. Pugh-McQueen has chronic allergies and moved from the first floor location to other buildings of the courthouse complex where her allergies are not a problem.
7. In 2000, construction began on a new addition to the courthouse. In spring of 2001, generators were placed in the basement outside the Clerk's office and the air handlers for the first floor were turned off. At times, the employees of the Clerk's office began to notice an odor.
8. The employees in the courthouse may have been exposed to carbon monoxide gas on one occasion during the summer of 2001. The employees noticed a haze in the Clerk's first floor office, which was believed to be gas. All the employees were evacuated outside. Emergency Medical Services (EMS) attended to the employees for apparent exposure to carbon monoxide. During this incident plaintiff experienced a bad headache and dizziness, was light-headed and had a racing heart beat. EMS took plaintiff's blood pressure and heart rate and counseled her on the symptoms to watch out for, but did not take her to the hospital. Plaintiff did not seek further medical treatment for this episode.
9. EMS allowed the employees to return to work late in the afternoon and the county brought in fans to dissipate the fumes. A carbon monoxide monitor was later placed in the building to check the air in the vicinity of the Clerk's office. Plaintiff testified that the alarm went off repeatedly.
10. In December 2001, while plaintiff was on vacation, Supco-88 was spilled in the generator room, which caused the air to smell bad. When she returned from vacation, plaintiff and her co-workers worked upstairs. Plaintiff believed that they worked upstairs because the chemical spill was hazardous to their health. Plaintiff related that she felt achy and had headaches, nausea, dizziness, a metallic taste in her mouth, and difficulty concentrating, which she associated with her exposure to Supco-88. The odor was stronger in the vault area.
11. Not knowing what the odor was and whether it was safe, Ms. Tucker moved all of her employees, including plaintiff, upstairs to the second floor and shut down the office on the first floor. Ms. Tucker explained that she did not move her employees to the second floor because the first floor was unsafe, but, rather, it was a precautionary measure.
12. The Occupational Safety Health Administration (OSHA) tested the courthouse for volatile organic compounds (VOC). Ms. Tucker required evidence that it was safe before she sent her employees back to work on the first floor. Subsequently, Ms. Tucker received an OSHA Compliance Certificate. This certificate indicates that the Clerk of Superior Court's offices were inspected on December 19 and 27, 2001, that no conditions warranting a citation were noted, and that the workplace was in compliance with applicable health and safety standards.
13. In February 2002, Keith Leese of Applied Environmental performed a site visit and walk-through of the courthouse to make recommendations and to further investigate the environment in the courthouse. Mr. Leese found several areas of visible fungal growth on building surfaces in both occupied and non-occupied areas of the courthouse. These areas were found under wall coverings that appeared normal, as well as wall coverings that appeared to have been exposed to water. Mr. Leese collected samples from the courthouse.
14. The results of Mr. Leese's testing are outlined in a report dated February 27, 2002, which was submitted as a stipulated exhibit. The report states,
 on the day of sampling, the airborne levels of fungi in the first floor areas of the Clerk of Criminal Court Vault . . . were not particularly elevated, however some Asperfillus fumigatus was detected in the Clerk of Criminal Court Vault area and a significant fraction of the airborne fungi in each area was of the Penicillium/Aspergillus group.
The testing disclosed elevated levels of Acremonium,Aspergillus niger, Aspergillus fumigatus, Aspergillusversicolor, Fusarium, Penicilium and Verticillium,
aeroallergens that may produce neurotoxic mycotoxins while the fungi grow and amplify on organic building materials with adequate moisture and which can elicit allergenic responses. When viable, these fungi are potential pathogens for immuno-compromised persons. Mycotoxins produced by the fungi can become airborne during events such as demolition.
15. In a March 18, 2002 letter, Mr. Leese stated that data from the collected samples showed elevated levels of Aspergillus niger, Aspergillus fumigatus, Aspergillusversicolor, and Fusarium from dust on surfaces associated with the air handlers. He further opined that there was "a large reservoir of visible fungi" ofVerticillium and Aspergillus versicolor. Mr. Leese described that these levels of fungi "are elevated and not considered to be normal in the indoor environment." He also noted "the presence of abnormal levels and types of airborne fungi has not been demonstrated." Mr. Leese recommended further study and that, at a minimum, a screening sampling should be performed for MVOCs and endotoxins in complaint areas of the courthouse.
16. Plaintiff testified that her disability began on January 31, 2002, when she began to have tremors after arriving at work. Ms. Lee described that she saw plaintiff trying to eat something at lunch, but that plaintiff could not get the food in her mouth. Ms. Lee described plaintiff's tremors as appearing real and she believed that no person could fake the tremors. Ms. Pugh-McQueen also saw plaintiff's tremors on January 31, 2002, and believed them to be real. Due to her tremors, plaintiff's co-workers helped her walk back to the courthouse. EMS was called and plaintiff was taken to New Hanover Regional Medical Center.
17. On January 31, 2002, plaintiff presented in the emergency room with headaches and tremors, and possible seizure. She gave a history of exposure to Supco-88 in October and December 2001 and the week of admission. Plaintiff also reported her prior history of high blood pressure, hypoglycemia, and psychological problems with insomnia and anxiety. Plaintiff was admitted into New Hanover Regional Medical Center for testing and observation.
18. While at New Hanover Regional Medical Center, plaintiff underwent tests to determine an organic basis for her symptoms. Extensive testing failed to reveal a neurological problem that explained plaintiff's symptoms. On February 1, 2002, plaintiff underwent a CT scan and MRI of the brain, with and without contrast, as well as chest x-rays. The CT scan and MRI were normal, and the chest films were normal, with a report of clear lungs. On February 5, 2002, Dr. Bachman, a neurologist, performed an electroencephalogram (EEG) study, which was normal with no evidence of seizures. An electrocardiogram showed a normal sinus rhythm.
19. Radiological testing at New Hanover Regional Medical Center reported a nodule on plaintiff's liver and lung. The medical records make no correlation between these findings and plaintiff's symptoms of headache and tremor. Subsequent x-rays were taken in August 2002 to make certain that the nodules did not represent cancer or other growths. These results were later reviewed by doctors at Duke University Medical Center, who thought that the lung nodule might be vascular in nature.
20. On February 8, 2002, plaintiff was discharged from New Hanover Regional Medical Center. The discharge summary reported that plaintiff was admitted for non-specific neurological symptoms, including variable intention tremor/resting tremor, ambulatory weakness/instability, and dizziness. The discharge summary notes that a neurological consultation was obtained, no specific abnormality or possible etiology was determined, and that plaintiff's clinical examinations were variable and inconsistent throughout the hospitalization. Plaintiff was given a final diagnosis of variable intention tremor with unknown etiology, solitary right pulmonary nodule evidenced on CT scan, anxiety disorder and hypertension. Plaintiff was discharged from the hospital with instructions to follow up with occupational therapy, internal medicine, and neurology. She was placed on multiple medications, including BuSpar for anxiety. While in the hospital, plaintiff was treated briefly with Dilantin, an anti-seizure medication, which was discontinued in favor of Ativan, also an anti-anxiety medication.
21. Plaintiff was subsequently admitted for observation and testing at Duke University Medical Center on February 12, 2002. The medical records from Duke give a reported history from plaintiff of a four month period of multiple neurological symptoms, including tremor, which plaintiff believed to be related to possible chemical exposures. Plaintiff reported exposure to carbon monoxide in July 2001 with three days of headache, nausea, and vomiting. Plaintiff also reported exposure to multiple environmental chemicals, including carpet glue and Supco-88, and that she frequently worked in a records vault with limited ventilation.
22. The Duke medical records reflect concern for tremor, pulmonary nodule, and headache. Plaintiff's physical examination revealed a normal neurological examination, with cranial nerves III-XII intact and no focal motor weakness except for a 4/5 left hip and knee flexion, which was believed to be secondary to an unrelated motor vehicle accident. Neurology was consulted regarding plaintiff's "unusual physical examination and inconsistent tremor." It was not clear whether the tremor was related to fatigue or was simply inconsistent.
23. The physicians at Duke considered toxic chemical exposure, multiple sclerosis, and hypothyroidism as potential causes for plaintiff's symptoms. Once again, plaintiff went through testing, which failed to show any organic basis for her complaints. An MRI was obtained to rule out evidence of demyelinating disease or cerebellar disease and the MRI was negative. A whole body PET scan was also negative and there was no evidence of a central nervous system disorder to explain plaintiff's tremors and headaches. None of the physicians at Duke could find a physical basis for or confirm a diagnosis for plaintiff's condition. Plaintiff did not have any clear evidence of a central nervous system deficit. The pulmonary nodule was believed to be vascular and does not appear to be relevant to this claim.
24. Plaintiff's lungs were reported to be clear and she was moving air well, x-rays of the lungs reported no acute disease, and the PET scan was normal. With reference to headaches, the Duke records reflect that plaintiff's primary complaints during the admission were related to headaches, which she experienced on and off since July 2001 and nearly continuously since November 2001. No intercranial abnormality was noted on the MRI to explain the headaches. It was believed that the headaches might be analgesic rebound headaches from use of Darvocet and other analgesics and narcotics for plaintiff's painful lipoma. Plaintiff was cautioned about over-use of analgesics and the subsequent rebound headaches that could follow.
25. Medical records from Duke confirm that plaintiff has a past history of hypertension, painful lipoma in the left shoulder, reflux disease, and left leg edema secondary to a motor vehicle accident in 2001. The Duke medical records are also significant for plaintiff's report that her father died of an astrocytoma at age 56, which may have been related to a chemical spill at work.
26. On February 13, 2002, plaintiff was discharged from Duke University Medical Center with instructions to follow up with her primary care doctor, Dr. Shea McManus. When plaintiff returned to see Dr. McManus on February 25, 2002, Dr. McManus reported that plaintiff had symptoms of tremor with associated motor weakness/ambulation instability and associated headaches, and that she was being evaluated by occupational medicine, neurology, surgery, and internal medicine for possible etiologies, including possible toxic exposure to benzenes or Aspergillus/mycotoxins. Dr. McManus wrote that it was highly unlikely that plaintiff had a central nervous system fungal infection because of her normal imaging studies.
27. Dr. McManus scheduled examinations for plaintiff with Dr. Amanda Trimpey, occupational medicine specialist, Dr. Paul Kamitsuka, infectious disease specialist, and Dr. Daniel Tesfaye, neurologist. On June 18, 2002, Dr. McManus diagnosed plaintiff with "anxiety disorder."
28. On February 20, 2002, Dr. Trimpey reported that plaintiff was complaining of a "constellation of symptoms," including fatigue, tremors, headaches, shortness of breath, cough and lethargy, with concern by plaintiff that the symptoms may be related to possible workplace exposure. The Initial Health Record from Dr. Trimpey's office revealed that plaintiff's past medical history includes shoulder lipoma, arthritis or joint problems, back and neck problems, depression, nerves, and anxiety treatment.
29. Plaintiff reported to Dr. Trimpey that her symptoms were improving since she was no longer working in the "vault" area of her workplace. Based upon this report, Dr. Trimpey believed that plaintiff could return to work with avoidance of the vault area. On April 25, 2002, Dr. Trimpey reported that plaintiff's symptoms were improving and that she was encouraged to resume a normal activity level.
30. Plaintiff also saw Dr. Kamitsuka, at the request of Dr. McManus. Dr. Kamitsuka expressed that the issue was whether plaintiff's condition was a "conversion type reaction" or an actual "illness." Dr. Kamitsuka consulted with Dr. David Bachman, the neurologist who treated plaintiff in New Hanover Regional Medical Center. Dr. Bachman reported that plaintiff had an extensive workup, including MRI, EEG, and laboratory studies, which were all negative. Dr. Bachman questioned whether plaintiff's symptoms were psychiatric, based on the negative findings and that when she was placed on BuSpar, an anti-anxiety medicine, plaintiff's symptoms stopped.
31. Dr. Kamitsuka's impression was that any association between plaintiff's symptoms and alleged toxic exposure was unproven, particularly in light of her extensive inpatient workup. Dr. Kamitsuka found no indication of any ongoing infection and suspected a conversion reaction was responsible for plaintiff's tremors. Dr. Kamitsuka referred plaintiff to Dr. Paul Buongiorno, a board certified psychiatrist, for assessment of her psychiatric condition and for pharmacologic intervention.
32. On March 19, 2002, plaintiff saw Dr. Buongiorno and reported that she sustained a sudden onset of body tremors on January 31, 2002, when she was working in the basement of the courthouse. Plaintiff believed that her work-related exposure to mold in the ventilation system and to Supco-88 caused her symptoms. Plaintiff also reported carbon monoxide exposure in the summer of 2001. Plaintiff reported symptoms of headaches, nausea, fatigue, memory loss, decreased energy level, and involuntary shaking throughout the entire body.
33. Dr. Buongiorno reported that plaintiff appeared to be anxious and in severe distress and that she had total body tremors during the entire interview. Dr. Buongiorno noted that she was on several medications, including Ultracet, Buspar and Ativan, which he stopped or tapered off. Dr. Buongiorno placed plaintiff on Zyprexa, an anti-anxiety drug, to determine whether her symptoms were caused by anxiety. Dr. Buongiorno also scheduled plaintiff for neuropsychological testing.
34. On March 26, 2002, Dr. Buongiorno reported that the use of Zyprexa produced considerable improvement in plaintiff's tremors. The Zyprexa improved plaintiff's sleep and tremors, which was a strong indication that her tremors were anxiety-related. On April 4, 2002, Dr. Buongiorno reported that plaintiff was now off all other medications and that while on Zyprexa alone, plaintiff's tremors were "completely gone." By April 30, 2002, plaintiff's dosage of Zyprexa was reduced and she continued to show signs of improvement.
35. Plaintiff was gradually taken off Zyprexa, however, she developed some anxiety about returning to work and Dr. Buongiorno again initiated its use. On May 8, 2003, Dr. Buongiorno reported that the medications were controlling plaintiff's tremors. It appeared that stress exacerbated the tremors.
36. Dr. Buongiorno testified that plaintiff met the diagnostic criteria and was assessed with adjustment disorder. Dr. Buongiorno testified that an adjustment disorder is a psychiatric condition in which a precipitating event causes a sufficient amount of emotional distress, which then causes a psychological impact on an individual's social and occupational functioning.
37. Plaintiff last saw Dr. Buongiorno in September 2002, when she reported that she was treating with Dr. Ritchie Shoemaker, a board certified primary care physician. Dr. Buongiorno's records report that Dr. Shoemaker was treating plaintiff with Inderal, Cholestyramine (CSM) and Sorbitol. Inderal is an anti-hypertensive beta-blocker, which is often used for treatment of anxiety.
38. Dr. Buongiorno limits his practice to psychiatry and testified that he would defer to Dr. Bachman's and Dr. Tesfaye's opinions as to whether plaintiff sustained a neurological injury. Dr. Buongiorno also stated that he would defer to the opinions of Dr. Shoemaker. He further testified, however, that he had never met Dr. Shoemaker, was not familiar with the medical tests that Dr. Shoemaker performed, and did not know whether Dr. Shoemaker's diagnostic testing and his opinions are accepted in the medical community.
39. On April 1, 2002, plaintiff saw Antonio Puente, Ph.D., a neuropsychologist. Similar to plaintiff's testimony and the records from Duke, plaintiff related to Dr. Puente that her father was a chemical operator who died of a brain tumor. Although there was no formal connection, plaintiff believed her father's disease was related to his employment because his predecessor for his job also died of a brain tumor. Plaintiff reported to Dr. Puente that she had headaches and full body seizures/tremors, which she believed resulted from exposure to carbon monoxide, carpet glue, a chemical spill, and mold.
40. Psychological testing revealed that plaintiff had an elevated conversion hysteria scale with significant affect problems and somatization. Dr. Puente found that plaintiff had "significant emotional problems noted on the testing, although the tests of effort are within normal limits." Dr. Puente determined that plaintiff had a "strong emotional component, which has been labeled anxiety and could be reactive and associated with the difficulties at work."
41. On May 1, 2002, plaintiff was examined by Dr. Tesfaye, board certified in both neurology and psychiatry. Dr. Tesfaye noted that Dr. Bachman also treated plaintiff and believed plaintiff's condition could be psychosomatic. Dr. Tesfaye reviewed medical records from Dr. Puente, Dr. Kamitsuka, and Dr. Buongiorno. Dr. Puente and Dr. Buongiorno noted that plaintiff needed pharmacological and psychotherapeutic intervention for a psychiatric condition, and that plaintiff's symptoms had stopped while on Zyprexa.
42. Dr. Tesfaye informed plaintiff that toxic gases and substances may cause damage to the central nervous system, but that this condition would be apparent on imaging studies. The normal MRI of the brain evidenced that plaintiff did not sustain that type of damage. Dr. Tesfaye found that plaintiff had a normal neurological examination. Dr. Tesfaye noted that plaintiff's symptoms were a type of pseudoseizure that was controlled with Zyprexa, and that her anxiety disorder was the cause of her symptoms. Plaintiff told Dr. Tesfaye that Zyprexa improved her symptoms.
43. Dr. Tesfaye testified that plaintiff had a psychogenic tremor, which he suspected came from an underlying somatization disorder or anxiety disorder. The cause for the psychogenic tremors is unknown. In these circumstances, the mind is causing the symptoms and the patient does not have a real physiological or organic cause for the symptoms. Dr. Tesfaye explained that most patients with non-epileptic seizures have anxiety or panic attack related disorders and they do very well with antidepressants, antipsychotics, and mood stabilizer medications.
44. Dr. Tesfaye agreed with Dr. Kamitsuka's conclusion that plaintiff had some type of conversion disorder. Dr. Tesfaye conceded that he is not an expert on mold or other toxic exposures and that he has not performed the same tests used by Dr. Shoemaker. However, Dr. Tesfaye questioned the relevance of the studies performed by Dr. Shoemaker, which he did not believe would be helpful in determining movement disorders or other neurological disorders.
45. Dr. Tesfaye testified that his own expertise was in neurological injuries, whether caused by toxic exposure, trauma, or congenital or hereditary disease. Dr. Tesfaye explained that he is qualified to determine whether tremors or spells are pathological or psychogenic. He normally does not rely on the opinions of family practitioners in cases of potential toxicological injury, but would generally rely on occupational medicine experts or tertiary centers, such as Duke University Medical Center.
46. Dr. Tesfaye explained that as a neurologist, he first considered whether there was a neurological lesion or other neurological cause for plaintiff's complaints. Trembling, shakiness, and dizziness raise questions of an injury to the central nervous system. Physical examination, MRI and EEG studies are relevant to determine whether there is an injury to the central nervous system. Dr. Tesfaye could not find any evidence of neurological injury in plaintiff, whether or not it was caused by a toxic exposure. When a physiological cause for a condition cannot be found, a physician will look for a potential psychological cause.
47. Dr. Tesfaye testified that he recognized as authoritative publications from the American College of Occupational and Environmental Medicine (ACOEM) and the Center for Disease Control. The ACOEM recognizes three human conditions which may be associated with exposure to mold: (1) immediate hypersensitivity, (2) hypersensitivity pneumonitis and uncommon allergic syndromes, such as bronchopulmonary aspergillosis and, (3) allergic fungal sinusitis. Dr. Tesfaye did not find any strong evidence to suggest that plaintiff's complaints and findings are from any exposure to a biotoxin.
48. Dr. Shoemaker is the only physician to render an opinion that would explain an organic, as opposed to psychological, cause of plaintiff's tremors and associate them with exposures in her workplace. It is his opinion that plaintiff sustained an occupational disease from her exposure to mold in her employment. Dr. Shoemaker, who is located in Pocomoke, Maryland, is a primary care doctor who is board certified in family practice. Dr. Buongiorno referred plaintiff to Dr. Shoemaker at the request of plaintiff and her attorney, who requested the one-time consultation in association with this litigation.
49. Dr. Shoemaker examined plaintiff on August 27, 2003. He spent two and a half hours conducting his assessment of plaintiff. Dr. Shoemaker reviewed plaintiff's medical history, including the testing previously done in Wilmington and at Duke Medical Center. He examined her and also did further testing and blood work. Dr. Shoemaker testified that when the examination started, plaintiff's energy level seemed normal, but that as they progressed, she appeared to fatigue. After about an hour and a half, plaintiff developed an unprovoked onset of tremors. At the conclusion of his examination, plaintiff's family took her out in a wheelchair and helped her into the van.
50. Dr. Shoemaker uses six criteria to determine whether a patient has a biotoxin associated illness: (1) a deficit in visual contrast sensitivity, (2) presence of HLADR, a genetic marker of the immune response genes associated with an extraordinarily increased susceptibility to mold, (3) a deficit in melanocyte stimulating hormone, (4) an elevation of an inflammatory compound called matrix metalloproteinase 9, (5) dysregulation of antiduretic hormone and osmolality measured simultaneously, and (6) a dysregulation of cortisol and ACTH. Dr. Shoemaker explained that, in his opinion, a valid diagnosis required at least three of the six criteria and that plaintiff had the first five criteria. Dr. Shoemaker testified that plaintiff's other physicians did not run the laboratory studies necessary to make the proper diagnosis.
51. As a result of his examination and testing, Dr. Shoemaker diagnosed plaintiff with chronic biotoxin associated illness. Dr. Shoemaker opined that plaintiff's condition was caused by exposure to mold in her workplace. His opinion was based on his extensive interview with plaintiff, review of medical records, a visual contrast sensitivity test, laboratory tests, and a deep aerobic culture of her nose. Dr. Shoemaker recommended that plaintiff have further tests, which were performed at New Hanover Regional Medical Center in December 2003.
52. Dr. Shoemaker testified that these additional tests confirm that plaintiff suffers from fatigue, and also that the tests support his diagnosis. Dr. Shoemaker further explained that his testing revealed that plaintiff has a genetic marker, HLADR, of the immune response genes associated with increased susceptibility to mold. Thus, plaintiff is more susceptible to problems from exposure to mold than other people. Dr. Shoemaker also believed that plaintiff's symptoms were likely to progress, based on studies for myelin basic protein antibodies done on a different group of patients with multiple sclerosis.
53. Dr. Shoemaker recommended treatment with cholestyramine, a non-absorbable anti-binding resin that has been approved by the FDA. Plaintiff has not responded to this treatment, which Dr. Shoemaker testified was probably due to the extent and duration of her exposure and damage. Dr. Shoemaker believes plaintiff has neurologic and physiologic damage.
54. Dr. Shoemaker received his medical education at Duke University and was primarily involved in family practice until around 1997, when he developed an interest in the biotoxin Pfiesteria. Although he is not trained in the specialties of neurology, toxicology, epidemiology, or occupational medicine, he has developed an interest and is studying the area of illnesses caused by exposure to multiple kinds of microorganisms or biotoxins. In recent years, Dr. Shoemaker has limited his practice to patients with chronic illnesses, which are characterized by fatigue and multiple symptoms, and which he relates to exposure to "biologically produced neurotoxins."
55. Dr. Shoemaker is also the author of a book entitled "Desperate Medicine," in which he explains the political battles he has encountered with state and local public authorities. Dr. Shoemaker opined that the Centers for Disease Control does not keep up with the latest advances in medicine. He takes issues with their failure to accept his diagnoses and diagnostic procedures, although he acknowledged that his opinions on mold are not currently in any medical textbooks. Dr. Shoemaker conceded that plaintiff does not have fungal sinusitis, hypersensitivity pneumonitis, or immediate hypersensitivity, which are the three conditions recognized by the American College of Occupational and Environmental Medicine to be associated with mold exposure.
56. Plaintiff has not sufficiently established that Dr. Shoemaker's opinion is based on medically accepted standards of practice. Dr. Shoemaker's methods and opinions concern an area of medicine that is evolving. Further study may support his hypothesis and methods, and the same may become standard protocols in the field of exposure to biotoxins. However, at this time, the greater weight of the scientific evidence in the medical field fails to support his methods and conclusions.
57. Plaintiff has undergone extensive testing at Duke University Medical Center and New Hanover Regional Medical Center and these tests and evaluations tend to show that plaintiff's tremors are caused by psychological factors, in particular her pre-existing anxiety and somatization and/or conversion disorder. Plaintiff has deep fears related to chemical exposure, due to her perceptions concerning her father's cancer and death. The evidence fails to establish that her anxiety and somitization or conversion disorder were caused by factors peculiar to her employment.
58. Considering the overall medical evidence, and the qualifications and experience of the physicians who have examined plaintiff, the Full Commission gives more weight to the opinions of plaintiff's treating doctors, Dr. Bachman, Dr. Tesfaye, Dr. Kamitsuka, Dr. McManus, Dr. Puente, and Dr. Buongiorno, that plaintiff has a psychiatric disorder, rather than to the opinion of Dr. Shoemaker that plaintiff has a biotoxin associated illness from exposure to mold at the New Hanover County Courthouse.
59. The greater weight of the medical evidence also fails to establish that plaintiff sustained any permanent injury from exposure to carbon monoxide or Supco-88. If she had sustained injury due to such exposure, plaintiff would be expected to have an identifiable neurological injury. As discussed, plaintiff had MRIs of the brain, EEG, and other tests, and no evidence of a neurological injury has been found. Thus, although plaintiff may have been exposed to carbon monoxide, Supco-88, mold, and other substances at work, there is no evidence that these substances have caused her to sustain a physical injury or an occupational disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence fails to establish that plaintiff has sustained a compensable occupational disease within the definition of the Workers' Compensation Act. "Biotoxin associated illness" is not a specifically listed disease and therefore is governed by N.C. Gen. Stat. § 97-53(13). An employee seeking compensation for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) must establish that the disease or condition meets the following three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged," (2) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation" and, (3) there is a "causal connection between the disease and the employment." Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983); Futrell v. Resinall Corp.,151 N.C. App. 456, 566 S.E.2d 181 (2002), affirmed percuriam, 357 N.C. 158, 579 S.E.2d 269 (2003). Based upon the greater weight of the evidence, plaintiff failed to meet these criteria. See Nix v. Collins Aikman Co.,151 N.C. App. 438, 566 S.E.2d 166, (2002); Mills v.J.P. Stevens Co., 53 N.C. App. 341, 280 S.E.2d 802
(1981); Sebastian v. Hair Styling, 40 N.C. App. 30,251 S.E.2d 872, disc. rev. denied, 297 N.C. 301,254 S.E.2d 921 (1979).
2. Plaintiff must prove by the greater weight of the evidence, including the expert medical testimony, that it is not just possible but probable that she sustained an occupational disease. The greater weight of the evidence in this case fails to establish that probability. Edmonds v. Fresenius Med. Care, 359 N.C. 313,608 S.E.2d 755 (2005); Holley v. ACTS, Inc., 357 N.C. 228,581 S.E.2d 750 (2003).
3. The greater weight of the medical evidence fails to show that plaintiff sustained any injury from exposure to carbon monoxide in the summer of 2001 or from exposure to Supco-88. Therefore, plaintiff did not sustain an injury by accident due to a specific exposure to these substances. N.C. Gen. Stat. §§ 97-2(6), 97-53(13).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim must be and is hereby DENIED.
2. Each party shall pay their respective costs. Defendant shall pay the costs of depositions and expert witness fees previously approved.
This 21st day of October 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER