JOHN W. NIX, Employee-Plaintiff v. COLLINS & AIKMAN, CO., Employer, Self/Insured, (Constitution State Service, Company), Servicing Agent, Defendants

No. COA01-690

(Filed 16 July 2002)

**Workers' Compensation— hyperactive airways disease—personal sensitivity**

The Industrial Commission correctly found and concluded in a workers' compensation action that plaintiff had not sustained a compensable occupational disease where plaintiff contended that he had contracted hyperactive airways disease through his work as a chemist, but the Commission concluded that his condition was caused by his personal, unusual sensitivity to small amounts of certain chemicals and denied benefits. The role of the court is limited; there was competent evidence to support the

Commission's findings and the conclusions are supported by the facts.

Judge GREENE dissenting.

Appeal by plaintiff from opinion and award filed 2 October 2000 by the North Carolina Industrial Commission. Heard in the Court of Appeals 16 April 2002.

*Doran & Shelby, P.A., by David A. Shelby, for plaintiff-appellant.*

*Lewis & Roberts, P.L.L.C., by John H. Ruocchio, for defendant-appellee.*

TIMMONS-GOODSON, Judge.

John W. Nix ("plaintiff") appeals from an opinion and award of the North Carolina Industrial Commission ("Commission") denying his claim for compensation following an alleged occupational disease. For the reasons discussed herein, we affirm.

Plaintiff began employment with Collins & Aikman Co. ("defendant") in July of 1977 as a senior research chemist evaluating dyes and chemical dying procedures in the textile field. Plaintiff spent fifty percent (50%) of his time working in defendant's research and development lab at the corporate headquarters building located in Charlotte, North Carolina. The laboratory area was divided into an office space and laboratory space where the chemicals were mixed and applied. Defendant employed a laboratory technician who performed most of the actual lab testing under plaintiff's direction. Plaintiff rarely performed the tests himself.

During the seventeen years that plaintiff was employed with defendant, he often supervised "strike rate" tests, which were tests conducted for the purpose of heating dyes used on fabrics to determine the temperature at which the dye "strikes" or binds to the fabric. There were a large number of dyes and chemicals used in the laboratory for these tests, some of which were known to be respiratory irritants when present in high quantities.

Plaintiff's first reported respiratory problems were recorded in September of 1979 by Dr. William Kouri ("Dr. Kouri"), his family physician. Between 1979 and 1994, Dr. Kouri treated plaintiff for various respiratory problems including severe coughing and chest pain.

These episodes occurred every two to three years and were usually diagnosed as bronchitis. On 12 June 1994, plaintiff returned to Dr. Kouri's office, complaining of constant chest burning and severe coughing. Dr. Kouri's initial impression was that plaintiff had contracted pneumonia. Although plaintiff began experiencing respiratory problems as early as 1979, he did not connect the health problems to his employment until July of 1994. Plaintiff was diagnosed with Legionnaires disease in 1994.

After treatment by Dr. Kouri, plaintiff was referred to Dr. Carl Smart ("Dr. Smart"), a pulmonologist. Dr. Smart concluded that plaintiff had hyperactive airways disease and that, based upon his history, his symptoms were due to an occupational exposure to chemicals at his employment. Plaintiff remained under Dr. Smart's care for several years until he left the practice. Dr. Scott A. Kremers ("Dr. Kremers") assumed plaintiff's care after Dr. Smart's departure from the practice. When Dr. Kremers examined plaintiff, he discovered that plaintiff's airways were hypersensitive and were reacting to chemical fumes, car exhausts, cleaning fluids, perfumes, and other substances. However, Dr. Kremers opined that plaintiff's reaction was more of a personal "idiosyncratic" nature as opposed to any chemical exposure in the workplace.

Plaintiff was sent to Dr. Reginald T. Harris ("Dr. Harris"), a pulmonary disease specialist and a member of the Commission's Textile Occupational Disease Panel. Dr. Harris evaluated plaintiff on 24 January 1995. Dr. Harris found no evidence of obstructive or restrictive lung disease and concluded that there was not enough evidence to suggest that chemical exposures at work had precipitated plaintiff's problems. Plaintiff did not return to work after 12 July 1994.

In affirming the decision of the deputy commissioner to deny compensation, the Commission made the following pertinent findings of fact:

10. Plaintiff has claimed that he has developed hyperactive airways disease as a result of his exposure to chemicals during his employment with defendant. For the following reasons, he has not proven that allegation. Contrary to what he told Dr. Smart, he did not have "fairly extensive exposure" to hazardous chemicals; nor were his symptoms associated with chemical exposures at work until he was also reacting to any fumes, whether at work or at home. The lab where plaintiff worked was well ventilated. Plaintiff was not performing most of the tests himself and the

activities conducted in the lab usually involved small amounts of chemicals. Therefore, the evidence did not establish a hazardous exposure.

11. Even with an inaccurate history, Dr. Smart could not state that an employee in plaintiff's position would have been placed at an increased risk of developing hyperactive airways disease as compared to the general public not so employed. The medical evidence established only that there was a possible risk and possible relationship associated with plaintiff's workplace exposures, but, with the present state of medical knowledge, the exposures could not be said to be a probable significant contributing factor in the development of his hyperactive airways disease. Rather, if plaintiff did have some sort of a reaction to the chemicals at work, it was due to an unusual sensitivity on his part to small amounts of chemicals that would not be a problem for most people.

12. By the greater weight of the evidence, plaintiff was not proven to have been placed at an increased risk of developing hyperactive airways disease by reason of his exposure to chemicals at work as compared to the general public not so employed. Nor was plaintiff's workplace exposure proven to have been a significant contributing factor in the development of his pulmonary condition.

13. Plaintiff has failed to prove that he developed an occupational disease that was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.

Based upon the above findings of fact, the Commission entered the following conclusions of law:

1. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13); *Click v. Pilot Freight Carriers, Inc.,* 300 N.C. 164, 265 S.E.2d 389 (1980); *Booker v. Duke Medical Center,* 297 N.C. 458, 256 S.E.2d 189 (1979).

2. Plaintiff's condition was caused by his personal, unusual sensitivity to small amounts of certain chemicals. *Sebastian v. Hair*

NIX v. COLLINS & AIKMAN CO.

[151 N.C. App. 438 (2002)]

*Styling,* 40 N.C. App. 30, [251 S.E.2d 872], *disc. review denied,* 297 N.C. 301, 254 S.E.2d 921 (1979).

3. Plaintiff is not entitled to benefits under the Workers' Compensation Act for his hyperactive airways disease. N.C. Gen. Stat. § 97-2 *et seq.*

From this opinion and award plaintiff appeals.

In his first assignment of error, plaintiff contends that there is no competent evidence in the record to support the Commission's findings and conclusions that plaintiff has not sustained a compensable occupational disease. We disagree.

Appellate review of an opinion and award from the Industrial Commission is limited to a determination of "(1) whether the findings of fact are supported by competent evidence and (2) whether the conclusions of law are supported by the findings." *Barham v. Food World,* 300 N.C. 329, 331, 266 S.E.2d 676, 678 (1980). The findings of fact by the Commission are conclusive on appeal if supported by any competent evidence, even if there is evidence to support a contrary finding. *Allens v. Roberts Elec. Contr'rs,* 143 N.C. App. 55, 60, 546 S.E.2d 133, 137 (2001).

For an injury to be compensable under our Workers' Compensation Act, "it must be either the result of an 'accident arising out of and in the course of employment' or an 'occupational disease.'" *Booker v. Medical Center,* 297 N.C. 458, 465, 256 S.E.2d 189, 194 (1979) (citation omitted). Under N.C. Gen. Stat. § 97-53 (13), an occupational disease is defined as:

> Any disease, other than hearing loss covered in another subdivision of this section, which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

N.C. Gen. Stat. § 97-53 (13) (2001). Our Supreme Court has identified three elements which an employee must show in order to prove the existence of an occupational disease: "(1) the disease must be characteristic of a trade or occupation, (2) the disease is not an ordinary disease of life to which the public is equally exposed outside of the employment," and (3) proof of a causal connection between the disease and the employment. *Hansel v. Sherman Textiles,* 304 N.C. 44,

52, 283 S.E.2d 101, 106 (1981). In *Rutledge v. Tultex Corp.*, 308 N.C. 85, 301 S.E.2d 359 (1983), our Supreme Court further explained what is required in establishing the first two elements:

> To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. Thus, the first two elements are satisfied, if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally. "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation."

*Id.* at 93-94, 301 S.E.2d at 365 (quoting *Booker*, 297 N.C. at 475, 256 S.E.2d at 200). The burden is on plaintiff to show that he suffered a compensable occupational disease under N.C. Gen. Stat. 97-53(13). *See Norris v. Drexel Heritage Furnishings, Inc.*, 139 N.C. App. 620, 621, 534 S.E.2d 259, 261 (2000), *cert. denied*, 353 N.C. 378, 547 S.E.2d 15 (2001). "[F]indings regarding the nature of a disease—its characteristics, symptoms, and manifestations—must ordinarily be based upon expert medical testimony." *Id.* at 623, 534 S.E.2d at 262.

In the instant case, the Full Commission considered the testimony of four physicians who evaluated plaintiff: Dr. Kouri, Dr. Smart, Dr. Kremers, and Dr. Harris. Dr. Kouri testified that she had little information about the type of chemicals to which plaintiff was exposed, the extent of the exposure, and the duration and degree of exposure. Dr. Smart also admitted that he had no information about the actual chemicals to which plaintiff was exposed or their potential health effects. When asked whether plaintiff was at an increased risk than the public at large, he stated, "the general population, I can't speak for . . . but specific to him and for him, it is likely, once again that's what caused his cough." Dr. Smart admitted that plaintiff contracted Legionnaires disease in 1994, which could have produced the same symptoms of which he complained. Contrary to Dr. Smart's assertions, the Commission found that the lab where plaintiff was employed was "well ventilated" and that the evidence did not establish a hazardous exposure, since plaintiff would have reacted to any kind of fumes, not just chemicals he may have been exposed to at the workplace. The Commission further found that the medical evidence

by Dr. Smart only establishes that there was a "possible risk and relationship associated with plaintiff's workplace exposure, but, with the present state of medical knowledge, the exposures" could not have been a significant contributing factor in the development of hyperactive airways disease.

Dr. Kremers testified that the vast majority of the public would not react to the extremely small amount of chemicals that plaintiff may have been exposed to at the workplace. Dr. Kremers opined that plaintiff was only at an increased risk due to his "idiopathic" sensitivity to chemicals at the workplace. In fact, Dr. Kremers testified that plaintiff was not at a greater risk than the general population and that only plaintiff's sensitivities to the chemicals made him more susceptible to the disease. Dr. Kremers further stated that plaintiff's sensitivity was not solely limited to chemicals to which he was exposed to in the workplace; rather, other chemicals such as fumes, perfumes, auto emissions, and pollution had the same effect.

Lastly, Dr. Harris opined that based upon his evaluation of plaintiff in 1998 and his review of the medical records, plaintiff's condition was not exacerbated or accelerated by his work conditions. Dr. Harris found no evidence of "obstructive or restrictive lung disease" and concluded that there was not enough evidence to suggest that chemical exposures at work may have precipitated the problems. Dr. Harris further opined that plaintiff's sensitivities to chemicals were of a pre-existing idiopathic nature and were aggravated by normal experiences common to the general public, unrelated to any chemical exposure at the workplace. See Sebastian v. Hair Styling, 40 N.C. App. 30, 32, 251 S.E.2d 872, 874 (holding that "there is no evidence whatsoever that subsequent to 31 January 1977 plaintiff's incapacity to earn wages was a result of an occupational disease; rather, it was the result of her personal sensitivity to chemicals used in her work."), disc. review denied, 297 N.C. 301, 254 S.E.2d 921 (1979).

Although evidence was presented that plaintiff had hyperactive airways disease, caused in whole or in part by his exposure to chemicals throughout his employment with defendants, the role of this Court is limited, and we cannot say that the Commission erred, as a matter of law, in its findings and conclusions. There was competent evidence to support the Commission's findings of fact and the conclusions of law are supported by the findings. We therefore hold that the Commission properly found and concluded that plaintiff has not sustained a compensable occupational disease.

NIX v. COLLINS & AIKMAN CO.

[151 N.C. App. 438 (2002)]

Accordingly, the opinion and award of the Full Commission is affirmed.

Affirmed.

Judge HUNTER concurs.

Judge GREENE dissents.

GREENE, Judge, dissenting.

There is no dispute in this case plaintiff suffers from hyper-reactive airways disease. The only question is whether this disease qualifies as an occupational disease within the meaning of the Workers' Compensation Act.

Central to the Commission's denial of benefits to plaintiff was its finding that any reaction plaintiff had to chemicals at work "was due to an unusual sensitivity on his part to small amounts of chemicals that would not be a problem for most people." Relying on *Sebastian v. Hair Styling*, 40 N.C. App. 30, 251 S.E.2d 872, *disc. review denied*, 297 N.C. 301, 254 S.E.2d 921 (1979), the Commission then concluded "[p]laintiff's condition was caused by his personal, unusual sensitivity to small amounts of certain chemicals."

The Commission's reliance on *Sebastian* as a basis for denying plaintiff benefits in this case is misplaced and constitutes error. Prior to 31 January 1977, the plaintiff in *Sebastian* had developed a skin condition due to her sensitivity to chemicals used at the hair salon for which she worked. The plaintiff's skin condition cleared up within one month of her terminating her employment as a hair stylist, and she suffered no continuing disability as a result of the skin condition. The Commission recognized the plaintiff's skin condition as an occu-pational disease and awarded medical expenses and temporary total disability benefits. The Commission did, however, deny the plaintiff any disability benefits beyond 31 January 1977, the date by which the skin condition had ceased. It was this denial of disability benefits the plaintiff appealed and which this Court considered in *Sebastian*. Accordingly, *Sebastian* does not stand for the proposition that a con-dition caused by the interaction of an employee's sensitivities to work-related factors is not compensable under the Workers' Compensation Act. Instead, *Sebastian* simply holds that if an employee's occupational disease ceases after the employee leaves the work environment that caused the disease and the employee does not

suffer from any lasting effects, she will be denied disability benefits after the healing date.

In this case, the evidence revealed and the Commission found Plaintiff had an "unusual sensitivity . . . to small amounts of chemicals." It is immaterial that this "would not be a problem for most people." *See* 1 Arthur Larson, *Larson's Workers' Compensation Law* § 9.02[1] (2001) (as the "employer takes the employee as it finds that employee," an employee's preexisting disease or infirmity is compensable under the Workers' Compensation Act if the employment aggravated, accelerated, or combined with the disease or infirmity to cause disability). The relevant issues are whether plaintiff had a sensitivity to chemicals he came in contact with at work and as a result of this contact his lung disease was aggravated and, if so, whether his employment exposed him to a greater risk of having the disease aggravated than the risk assumed by the general population suffering from the disease.

I would reverse the opinion and award of the Commission and remand for the entry of new findings and conclusions.