STEVE R. JONES, Employee, Plaintiff v. STEVE JONES AUTO GROUP, Employer, and UNIVERSAL UNDERWRITERS GROUP, Carrier, Defendants

No. COA08-1593

(Filed 3 November 2009)

**1. Workers' Compensation— workplace mold—requirement to work in contaminated location**

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff contracted an occupational disease from mold in his office. Although the nature of plaintiff's work as an auto dealership manager did not increase his risk for contracting pulmonary airway disease, the fact that his employment required him to work in a building contaminated with mold did place him at an increased risk.

**2. Workers' Compensation— workplace mold—causal connection to illness**

There was competent evidence in a workers' compensation case to support the Industrial Commission's findings that plaintiff's workplace exposure to mold caused his illness. There was no support for defendant's statement that the air sampling relied on by plaintiff's treating physicians did not reflect the air plaintiff breathed.

**3. Workers' Compensation— workplace mold—no evidence of peculiar sensitivity**

Although defendants argued in a mold-related workers' compensation case that plaintiff's illness was the result of a preexisting personal sensitivity and was not compensable, there was no evidence that plaintiff had a heightened peculiar sensitivity to mold before his exposure in the workplace.

**4. Workers' Compensation— workplace mold—findings— ubiquitous mold**

Testimony in a workers' compensation proceeding was competent to support challenged findings regarding plaintiff's occupational mold exposure despite defendant's contention that there was no competent evidence to distinguish plaintiff's occupational exposure from ubiquitous mold.

**5. Workers' Compensation— third-party settlement—lien not waived—remand**

Defendants in a workers' compensation case did not waive their right to pursue a lien against third-party settlement proceeds where such a lien was the subject of a stipulation and a settlement agreement. The Industrial Commission failed to determine whether third-party settlement proceeds had been distributed, or to whom, and whether defendants were entitled to a lien. The matter was remanded.

Appeal by Defendants from Opinion and Award entered 12 September 2008 by the North Carolina Industrial Commission. Heard in the Court of Appeals 18 May 2009.

*Van Camp, Meacham & Newman, PLLC, by Thomas M. Van Camp, for Plaintiff.*

*Brooks, Stephens & Pope, P.A., by Matthew P. Blake and James A. Barnes IV, for Defendants.*

STEPHENS, Judge.

*I. Procedural History*

On 3 January 2005, Plaintiff Steve R. Jones completed an Industrial Commission Form 18 seeking benefits for disability allegedly due to mold exposure in his place of employment. On 9 September 2005, Defendant Steve Jones Auto Group and Defendant Universal Underwriters Group (collectively, "Defendants") completed a Form 61 denying Plaintiff's claim. On 22 May 2006, Plaintiff filed a Form 33 request for hearing. The claim was heard by Deputy Commissioner Wanda Blanche Taylor on 21 June 2007. Deputy Commissioner Taylor entered an Opinion and Award on 1 February 2008 awarding Plaintiff benefits. From this Opinion and Award, Defendants appealed to the Full Commission. The matter was heard by the Full Commission on 5 August 2008, and by Opinion and Award entered 12 September 2008, the Full Commission affirmed with modifications Deputy Commissioner Taylor's Opinion and Award. Defendants appeal.

*II. Factual Background*

Plaintiff, 51 years old at the time the matter was heard by the Full Commission, is part-owner of Steve Jones Auto Group. In 1998, in his capacity as minority owner and employee, Plaintiff opened two new

dealerships, Steve Jones Honda and Steve Jones Chevrolet. Plaintiff served as general manager of both dealerships. Plaintiff was responsible for making all management decisions, and oversaw sales, finance, and insurance. Plaintiff often worked 10-hour days and was described as very professional, sharp, and good with both customers and finances. At no time prior to mid-2000 did Plaintiff experience any medical ailments that prevented him from performing his duties and responsibilities on a full-time basis.

Between late 1999 and mid-2000, the building which housed Steve Jones Honda, and Plaintiff's office, was remodeled. After the remodeling was completed, Plaintiff moved back into his office in the building. However, Myrick Construction's failure to properly caulk and seal along the base of the exterior wall of Plaintiff's office caused water intrusion into the wallboard, wall cavity, sheetrock, and carpeting of Plaintiff's office.

In late 2000, Plaintiff began to experience medical problems, including excessive and uncontrolled coughing, wheezing, a burning sensation in his nose and mouth, headaches, dizziness, and a lack of energy. Plaintiff's work performance began to deteriorate as Plaintiff lost his ability to calculate numbers in his head, and Plaintiff had severe memory problems. Plaintiff's medical and performance issues continued to worsen until September 2003. Plaintiff continued to receive a wage of $10,000 per month during this time, even though he was not performing his duties as general manager.

In April 2003, Steve Jones Auto Group's majority owner, Tom Davis, removed Plaintiff as general manager of the dealerships. Davis continued to pay Plaintiff his monthly salary until 28 December 2005. Plaintiff has not received a salary since that date.

In August 2003, Plaintiff's wife was undergoing a medical procedure performed by Dr. Jonathan Hasson, a vascular surgeon. During the procedure, Plaintiff began to cough uncontrollably and had to leave the room. After the procedure, Dr. Hasson spoke with Plaintiff about his symptoms and work conditions. Dr. Hasson opined that Plaintiff's symptoms may be the result of mold exposure. Following Plaintiff's discussion with Dr. Hasson, Plaintiff contacted Myrick Construction and had a representative from Myrick cut several holes in the wall of his office. The holes revealed that the wall cavity was "heavily laden" with black mold, with mold growing inside the sheetrock, insulation, and electrical receptacles.

JONES v. STEVE JONES AUTO GRP.

[200 N.C. App. 458 (2009)]

Plaintiff then contacted Mike Shrimanker of EEC, Inc., a certified industrial hygienist, registered professional engineer, certified safety professional, certified audio-metric technician, and certified Asbestos Hazard Emergency Response Act inspector. Mr. Shrimanker advised Plaintiff to leave the office and lock the door until Mr. Shrimanker arrived. When Mr. Shrimanker arrived, he observed black mold on the back of the sheetrock that had been cut out of the wall and on the backs of Plaintiff's chairs. Mr. Shrimanker took air and tape samples from inside Plaintiff's office to identify what kinds of mold were present. He also took air and tape samples from outside the building.

The mold testing established that there was no stachybotrys, commonly known as black mold, in the outdoor samples, but high levels of stachybotrys in the samples taken from inside Plaintiff's office. Mr. Shrimanker testified that stachybotrys should not have been present inside or outside of Plaintiff's office in any amount and that the average member of the general public is not exposed to stachybotrys on a regular basis. The testing further revealed that there was no aspergillus, another type of mold, in the outdoor samples, but elevated levels of aspergillus in the samples taken from inside Plaintiff's office. In addition, the testing revealed small levels of penicillium, a type of mold, in the outdoor samples, and significantly higher levels of penicillium in the samples taken from inside Plaintiff's office. Mr. Shrimanker testified that although aspergillus and penicillium are commonly found in the outside air, their levels should be greater outdoors than indoors. Testing of Plaintiff's home revealed no elevated levels of mold.

Dr. Donald E. Schmechel, a clinical professor of medicine at Duke University and board certified in neurology and psychology, first saw Plaintiff on 13 October 2003. He performed a physical examination of Plaintiff and diagnosed him with "asthmatic reactive airway disease." Dr. Schmechel also performed a neurological exam, which included cognitive screening, and diagnosed Plaintiff with "mild cognitive impairment[.]" According to Dr. Schmechel, there is no indication that Plaintiff suffered from any cognitive defects prior to his exposure to mold. It was Dr. Schmechel's opinion that Plaintiff's pulmonary airway disease is most likely the cause of his cognitive dysfunction.

Dr. Peter Kussin, an associate clinical professor of medicine at Duke University in the Division of Pulmonary, Allergy, and Critical Care Medicine, first saw Plaintiff on 23 October 2003. According to

Dr. Kussin, before Plaintiff's exposure to mold, Plaintiff's childhood asthma had resolved and was asymptomatic. In October of 2003, however, Dr. Kussin reported that Plaintiff had evidence of both upper and lower airway problems, including hyperinflation of the lungs, inflammation and narrowing of his airways, and abnormalities of his upper airway and vocal chords. Dr. Kussin opined that Plaintiff's persistent asthma and related symptoms were caused by his exposure to mold at work.

Plaintiff also saw Dr. David C. Thornton, a physician at the Pinehurst Medical Clinic and board certified in internal, pulmonary, critical care, and sleep medicine, in October 2003. At the time of Plaintiff's first visit, he complained of a marked aggravation in his respiratory symptoms, including sudden onsets of shortness of breath and a terrible cough. Plaintiff also reported having problems with memory and dizziness, and an inability to focus. Dr. Thornton testified that stachybotrys is at the top of the list of dangerous molds because it is capable of provoking an immune response and because it produces toxins that can affect the human body and human function. Dr. Thornton opined that Plaintiff's prolonged exposure to the combination of stachybotrys, aspergillus, and penicillium "perpetuated and established in [Plaintiff] an immunologic state that perpetuated a very serious illness." In Dr. Thornton's opinion, Plaintiff's exposure to the high levels of mold at work was "the factor" in the onset of Plaintiff's lung inflammation.

### III. Discussion

Appellate review of an opinion and award of the Full Commission is generally limited to (i) whether the Commission's findings of fact are supported by competent evidence, and (ii) whether the Commission's conclusions of law are justified by the findings of fact. *Clark v. Wal-Mart*, 360 N.C. 41, 43, 619 S.E.2d 491, 492 (2005). The Full Commission's conclusions of law are reviewed *de novo*. *Bond v. Foster Masonry, Inc.*, 139 N.C. App. 123, 127, 532 S.E.2d 583, 585 (2000).

### A. Occupational Disease

[1] By Defendants' first argument, Defendants contend that the Commission erred in concluding that Plaintiff contracted an occupational disease as defined by N.C. Gen. Stat. § 97-53(13). We disagree.

N.C. Gen. Stat. § 97-53, which lists various compensable occupational diseases, does not include pulmonary airway disease among

these. However, a disease not specifically listed in the statute may nonetheless be compensable pursuant to N.C. Gen. Stat. § 97-53(13), which defines an occupational disease as

> [a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

N.C. Gen. Stat. § 97-53(13) (2007). Our Supreme Court has interpreted this language as requiring three elements in order to prove that a disease is an occupational disease: (1) the disease must be characteristic of and peculiar to the claimant's particular trade, occupation, or employment; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of a causal connection between the disease and the employment. *Rutledge v. Tultex Corp./Kings Yarn*, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983); *accord Hardin v. Motor Panels, Inc.*, 136 N.C. App. 351, 354, 524 S.E.2d 368, 371, *disc. review denied*, 351 N.C. 473, 543 S.E.2d 488 (2000). The first two elements of the *Rutledge* test are satisfied where the employee can show that "the employment exposed the worker to a greater risk of contracting the disease than the public generally." *Rutledge*, 308 N.C. at 94, 301 S.E.2d at 365. The third element is satisfied if the employment " 'significantly contributed to, or was a significant causal factor in, the disease's development.' " *Hardin*, 136 N.C. App. at 354, 524 S.E.2d at 371 (citation omitted). Since *Rutledge*, this two-pronged requirement for proving an occupational disease, increased risk and causation, has been approved and applied repeatedly by this Court and the North Carolina Supreme Court. *Hassell v. Onslow County Bd. of Educ.*, 362 N.C. 299, 306, 661 S.E.2d 709, 714 (2008).

### 1. Increased Risk

Defendants first challenge the sufficiency of the evidence to support the Commission's determination that Plaintiff's employment exposed him to an increased risk of contracting his illness as compared to the public generally. Specifically, Defendants argue that "[t]he Commission disregarded our Supreme Court precedent which requires a link between the nature of an employment and the alleged occupational disease." We are unpersuaded by Defendants' argument and conclude that, on the record before us, we are bound by the prior

decision of this Court in *Robbins v. Wake Cty. Bd. of Educ.*, 151 N.C. App. 518, 566 S.E.2d 139 (2002).

In *Robbins*, plaintiff filed a claim with the Commission seeking compensation for his wife's contraction of and death from mesothelioma. Plaintiff's wife ("Ms. Robbins") had worked for defendant as a secretary and graphic artist from 1978 to 1981. During her employment, Ms. Robbins worked at defendant's central administrative office building in a large room on the second floor that was divided by partitions. She also spent about two hours per day in the office's print shop and made daily trips to the basement of the building to place materials in courier boxes, which were located next to the boiler room. In 1988, a survey performed on the building revealed that the building contained substantial amounts of asbestos in the ceiling plaster, wall plaster, floor tile, pipe insulation in the boiler room and print shop, vibration dampers of the heating system, and numerous other areas.

In late 1992, Ms. Robbins developed a persistent cough. In January of 1993, a chest x-ray revealed a suspicious shadow in her lung, and a CT scan confirmed the presence of an egg-sized tumor in her right lung. Ms. Robbins was diagnosed with mesothelioma, a cancer most often associated with asbestos exposure. She died of the disease in June 1995 at the age of 41.

The Full Commission found and concluded that Ms. Robbins had contracted a compensable occupational disease as a result of her employment with defendant. In so concluding,

> [t]he Commission found as fact that [Ms. Robbins'] employment at defendant's . . . facility exposed her to a greater risk of contracting mesothelioma than the public generally. The Commission found that *while the nature of [Ms. Robbins'] employment as a secretary and graphic artist did not place her at risk for contracting the disease, the fact that her employment required her to work in a building with higher-than-normal levels of asbestos did place her at such a risk*, and that the risk was higher than that to which the general public was exposed, as not all buildings contain significant amounts of friable asbestos.

*Id.* at 521, 566 S.E.2d at 142 (emphasis added). In upholding the opinion and award of the Full Commission, this Court concluded that the Commission's findings were supported by the testimony of Dr. Victor

Roggli, an expert in the pathology of asbestos-related diseases of the lung, including mesothelioma. Dr. Roggli testified that it was his opinion that Ms. Robbins' exposure to asbestos at the building placed her at an increased risk for developing mesothelioma. He opined that mesothelioma is a disease which is characteristic of particular trades or occupations, such as Robbins' employment, where the employee is exposed to asbestos.

Dr. Roggli also testified that mesothelioma is not an ordinary disease of life that is typically seen in the general population. Dr. Roggli stated that mesothelioma is very rare among the general population, and that it is estimated that there exist only one or two cases per million people per year where mesothelioma develops without asbestos exposure. Thus, this Court concluded that "the Commission's findings with respect to the first two elements of the *Rutledge* test were sufficiently supported by competent evidence." *Id.* at 522, 566 S.E.2d at 142-43. This Court further concluded that the Commission's findings supported the Commission's conclusion of law that, as a result of her employment with defendant, Ms. Robbins sustained a compensable occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).

In the present case, the Full Commission found as fact that "Plaintiff's employment, and specifically, his exposure to mold for approximately three years, exposed [P]laintiff to a greater risk of developing his pulmonary airway disease than members of the general public not so employed."

This finding is supported by competent evidence in the record. Mr. Shrimanker testified that under normal conditions, "[t]he general public doesn't get exposed to stachybotrys" at any level. The results of the mold testing performed by Mr. Shrimanker on 27 August 2003 revealed a "large quantity" of stachybotrys in the tape and air samples taken from plaintiff's office, with no stachybotrys outside. Additionally, the test results revealed no aspergillus in the outdoor sample, but elevated levels of aspergillus in the samples from Plaintiff's office, and small levels of penicillium in the outdoor sample, with significantly higher levels of penicillium in samples taken from Plaintiff's office.

Dr. Thornton testified that stachybotrys is "perhaps the most noxious [mold] and most likely to affect human health in an adverse way." He further testified that Plaintiff's exposure to stachybotrys, aspergillus, and other molds present in his office placed him at an

increased risk, greater than that of members of the general public, of developing the inflammation in his lungs.

Dr. Kussin also testified that while there may be as many as five million adults in this country with asthma, no more than "[one] percent have asthma as a result of occupational exposures or environmental exposures that are not allergic . . . ." He further testified that "even a smaller subset of that [one] percent" sustain the type of problems that Plaintiff experienced.

We conclude that this testimony is competent to support the Commission's finding that Plaintiff's work placed him at an increased risk for contracting pulmonary airway disease.

Defendants argue that Plaintiff's testimony that he had visited hundreds of automobile dealerships in his 20-year career but only two had contained mold, as well as Dr. Thornton's testimony that he knows of no correlation between the auto dealership industry and mold-related disease, shows that there is no link between mold-related disease and auto dealerships. However, as in *Robbins*, although the nature of Plaintiff's employment as an automobile dealership manager did not increase his risk for contracting pulmonary airway disease, the fact that his employment required him to work in a building contaminated with mold did place him at an increased risk. Competent evidence in the record supports the Commission's determination that the risk to which Plaintiff was exposed was greater than the risk to which the general public is exposed as stachybotrys should not have been present in Plaintiff's office in any amount. Because the Commission's findings are supported by competent evidence, this Court is bound by them, even though the record also contains contrary evidence. *Gilberto v. Wake Forest Univ.*, 152 N.C. App. 112, 118, 566 S.E.2d 788, 792 (2002).

### 2. *Causation*

[2] Defendants next argue that the expert medical testimony relied upon by the Commission was not sufficient to prove a causal connection between Plaintiff's illness and his employment. Specifically, Defendants argue that medical experts erroneously premised their opinions "on the temporal relationship between discovery of mold [in] [P]laintiff's office and the onset of [P]laintiff's symptoms." Defendants' argument is meritless.

"[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed

from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). However, " 'expert opinion testimony [that] is based merely upon speculation and conjecture . . . is not sufficiently reliable to qualify as competent evidence on issues of medical causation.' " *Cannon v. Goodyear Tire & Rubber Co.*, 171 N.C. App. 254, 262, 614 S.E.2d 440, 445 (quoting *Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000)), *disc. review denied*, 360 N.C. 61, 621 S.E.2d 177 (2005); *see also Dean v. Carolina Coach Co.*, 287 N.C. 515, 522, 215 S.E.2d 89, 94 (1975) ("[A]n expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility.").

The Commission made the following findings of fact regarding causation:

25. Dr. Thornton was of the opinion that [P]laintiff's exposure to mold in the [workplace] was the cause of the inflammation in his lungs.

. . . .

29. In Dr. Thornton's opinion, the debilitating symptoms that [P]laintiff exhibits, including problems with breathing, coughing, inflamed airways, and the acceleration or exacerbation of those symptoms, as well as his cognitive defects are all caused by long term exposure to stachybotrys and other molds and their toxins.

. . . .

33. The basis for Dr. Thornton's causation opinion *is not just the temporal relationship*, which he described a[s] "quite compelling," but the level of mold on the occupational health testing, the types of mold present, the intensity of the exposure, the duration of the exposure, and the fact that anti-bodies were identified in [P]laintiff's blood stream.

. . . .

37. Dr. Kussin was of the opinion that [P]laintiff's persistent asthma was causally related to his exposure to mold at the [workplace]. . . .

. . . .

56. Plaintiff's [workplace] exposure to mold caused [P]laintiff's pulmonary condition and was a substantial contributing factor in the development of [P]laintiff's pulmonary airway disease and resulting conditions.

(Emphasis added.)

Dr. Thornton opined that Plaintiff's prolonged exposure to the combination of stachybotrys, aspergillus, and penicillium "perpetuated and established in [Plaintiff] an immunologic state that perpetuated a very serious illness" and that Plaintiff's symptoms and problems "were significantly aggravated if not caused completely" by his exposure to mold in the workplace. Dr. Thornton explained that while "there is not a specific medical test that would clearly demonstrate definitively" that Plaintiff's exposure to mold caused his illness, based on "the constellation of . . . [Plaintiff's] symptoms, the time course of their onset, [and Plaintiff's] response to therapy[,]" he felt strongly that Plaintiff's illness was caused by his exposure to mold in his workplace. Thus, contrary to Defendants' contention, Dr. Thornton's opinion is not based solely "on the temporal relationship between discovery of mold [in] [P]laintiff's office and the onset of [P]laintiff's symptoms."

Dr. Kussin testified that he did not know of another irritant or exposure, other than the mold, that would have been the primary cause of Plaintiff's symptoms and opined that Plaintiff's persistent asthma and related symptoms were caused by his exposure to mold at work.

Although Defendants argue that "[P]laintiff's treating physicians assumed drastic mold exposure based on air sampling data that did not reflect the air [P]laintiff breathed daily," Defendants cite no evidence from the record and make no argument in support of this assertion. Moreover, our review of the evidence reveals no support for this statement.

We conclude that the testimony of Dr. Thornton and Dr. Kussin is competent evidence to support the Commission's findings of fact that Plaintiff's exposure to mold at his place of work caused his illness. This Court is thus bound by these findings. *Gilberto*, 152 N.C. App. at 118, 566 S.E.2d at 792.

### 3. *Personal Sensitivity*

[3] Defendants further argue that Plaintiff's illness is not compensable as it is the result of a preexisting personal sensitivity. We disagree.

This Court has held that an individual's personal sensitivity to chemicals does not result in an occupational disease compensable under our workers' compensation scheme. *See, e.g., Hayes v. Tractor Supply Co.,* 170 N.C. App. 405, 612 S.E.2d 399 (2005), *disc. review denied,* 359 N.C. 851, 619 S.E.2d 505 (2005); *Nix v. Collins & Aikman, Co.,* 151 N.C. App. 438, 566 S.E.2d 176 (2002). In *Hayes,* plaintiff had an allergic reaction to the chemical naphthalene, which was stocked in plaintiff's employer's store. Plaintiff had a long history of allergies and reactions to substances, including a diagnosis of "chemical sensitivity," prior to her exposure to naphthalene at work. *Hayes,* 170 N.C. App. at 406, 612 S.E.2d at 401. Because plaintiff had a "heightened peculiar susceptibility to chemicals . . . [which] predated the exposure to naphthalene[,]" *id.* at 409, 612 S.E.2d at 402, this Court affirmed the Commission's conclusion that plaintiff had failed to prove "that her employment with defendant-employer placed her at an increased risk of contracting the present condition[.]" *Id.* at 408, 612 S.E.2d at 402 (quotation marks omitted).

Similarly, in *Nix,* plaintiff developed hyperactive airway disease. Although plaintiff contended that his condition was caused by his exposure to chemicals in the workplace, a testifying physician opined that "plaintiff was only at an increased risk due to his 'idiopathic' sensitivity to chemicals at the workplace[,]" *Nix,* 151 N.C. App. at 444, 566 S.E.2d at 179, and that "only plaintiff's sensitivities to the chemicals made him more susceptible to the disease." *Id.* at 444, 566 S.E.2d at 180. Thus, this Court affirmed the Commission's conclusion that "[p]laintiff's condition was caused by his personal, unusual sensitivity to small amounts of certain chemicals." *Id.* at 441, 566 S.E.2d at 178 (quotation marks omitted).

In this case, the Commission made the following findings of fact relevant to whether Plaintiff's illness was a result of a preexisting personal sensitivity:

> 30. Dr. Thornton was of the opinion that [P]laintiff's exposure to mold was occupational in nature and not a personal sensitivity that produces "a noxious reaction." . . .
>
> . . . .
>
> 63. Plaintiff's disability was not caused by a "personal sensitivity" to mold.

Dr. Thornton testified that "[i]n situations of allergic mediated asthma, or occupational asthma mediated by a toxin, we often see a

worsening of asthma due to the inflammatory response from an intense exposure." Dr. Thornton explained that the reaction can last for weeks, months, or longer, and symptoms can linger for years after the exposure to the toxin has terminated. He further explained that "[t]his is a common scenario in a number of different asthmatic exposures in the workplace, and could certainly be seen with any intense exposure to a mold. . . . And so, this is different than a sensitivity, for example, to something that produces a noxious reaction." Dr. Thornton further testified that "after an intense exposure, an allergic response is established. After the establishment of the allergic response, then that allergic response can continue and be perpetuated for years." Dr. Thornton stated that he had no way to know if Plaintiff was sensitive to the molds that were present in his office before he was exposed to them there. When asked if the exposure that Plaintiff experienced at his place of employment could have created an allergic response to the molds, Dr. Thornton replied, "Yes."

Dr. Kussin testified that Plaintiff's reaction to the mold was "not an allergy in the way you're allergic to dust or cats or . . . ragweed. The changes that occur in the type of asthma that [Plaintiff] has can only be described generically as inflammatory, and the word 'allergic' doesn't necessarily need to be invoked."

Thus, unlike in *Hayes* and *Nix*, and contrary to Defendants' contention, there is no evidence in this case that Plaintiff had a heightened peculiar susceptibility to mold which predated his exposure to the mold at his workplace. To the contrary, the evidence establishes that Plaintiff's sensitivity to mold was *caused* by his exposure to mold in the workplace. Accordingly, there is competent evidence to support the Commission's findings of fact on this issue. Defendants' argument is overruled.

We reiterate that, although the record contains evidence which would support contrary findings, the Commission's findings regarding the genesis and nature of Plaintiff's occupational disease are sufficiently supported by competent evidence in the record and are thus conclusive on appeal. *Robbins*, 151 N.C. App. at 523, 566 S.E.2d at 143. We hold that these findings support the Commission's conclusion of law that, as a result of Plaintiff's employment with Defendant Steve Jones Auto Group, Plaintiff developed a compensable occupational disease withing the meaning of N.C. Gen. Stat. § 97-53(13).

JONES v. STEVE JONES AUTO GRP.

[200 N.C. App. 458 (2009)]

## B. Occupational Mold Exposure

[4] Defendants next assert that "[t]here is no competent evidence that distinguishes Plaintiff's occupational mold exposure from mold that is ubiquitous in the environment." Specifically, Defendants argue that the Commission's findings of fact 10 through 17 are not supported by competent evidence.

The challenged findings of fact are as follows:

10. Mr. Shrimanker observed black mold in [P]laintiff's office prior to the tests. This mold was located on the inside of the sheetrock, insulation, and electrical receptacles as well as in the carpet in [P]laintiff's office. According to Shrimanker, the sheetrock behind the wall had also been "covered with mold" due to defects in construction, and the saturation had been going for a "long time."

11. Mr. Shrimanker was of the opinion that under normal conditions to which the general public is exposed, stachybotrys should not be present at any level. Although penicillium and aspergillus are commonly found in the outside air, the levels of aspergillus and penicillium should be greater outdoors than indoors. The mold testing performed on August 27, 2003 found no stachybotrys in the outdoor sample and high levels of stachybotrys in the tape and air samples in [P]laintiff's office. According to Mr. Shrimanker, both the air and bulk samples "indicated that stachybotrys spores were present in high concentrations." . . . There were small levels of penicillium in the outdoor sample, but the levels of penicillium in the air and tape samples in [Plaintiff's] office were significantly greater than the outdoor sample.[1]

12. Exposure to stachybotrys, which contains mycotoxins, can cause different symptoms in different individuals. Common symptoms include coughing, headache, dizziness, malaise, burning in the nose and mouth, and cold and flu-like symptoms. Plaintiff was experiencing most, if not all, of these symptoms between late 2000 and August 27, 2003 when the samples were originally tested.

---

1. The Commission errantly stated that "[t]he testing found no aspergillus in the tape and air samples in [Plaintiff's] office." However, the uncontradicted evidence established that the testing revealed no aspergillus in the outdoor samples, but elevated levels of aspergillus in the samples taken from inside Plaintiff's office.

13. Stachybotrys is known as "black mold," and, according to Mr. Shrimanker, is the most dangerous of the molds because of its ability to produce mycotoxins. Stachybotrys may produce a trichothecene mycotoxin-sutratoxin H—"which is poisonous by inhalation." Penicillium can cause extrinsic asthma and some species can also produce mycotoxins. Aspergillus can also produce mycotoxins.

14. As the mold dries out, it can be released by pressure, or walking on the carpet and by air movement through the use of air conditioning or heating unit. Defendants' expert, Dr. Dalton, agreed with this assessment. According to Mr. Shrimanker, mold can also travel from wall cavities into air through openings in the wall, including electrical receptacles.

15. The stachybotrys, penicillium, and aspergillus species found in [P]laintiff's office in the late 2000 through August 27, 2003 were released into the air in the office.

16. Between late 2000 and August 2003, as a result of [P]laintiff's presence in his office, he was exposed to and inhaled mold spores, including stachybotrys, penicillium and aspergillus.

17. Plaintiff's home was tested for mold and no unusual or elevated levels of mold were found.

Mr. Shrimanker testified that upon entering Plaintiff's office, he observed black mold on the inside of the sheetrock and on the back sides of Plaintiff's chairs. Mr. Shrimanker also took photographs which showed mold on the sheetrock, insulation, and electrical receptacles in Plaintiff's office. Mr. Shrimanker's report states that "no sealer or wall barrier(s) were installed at ground level near the wall(s) adjacent to the downspout" and, thus, "[i]t would be reasonable to assume that water enters the building and has kept the carpet and the interior space between the walls wet during heavy rain episodes." Mr. Shrimanker testified that "when rain stops and over a period of time the carpet dries out, and people walk and so forth, it will kick the spores into the air."

Mr. Shrimanker took tape samples of the mold from the back of the sheetrock, the back of the wallpaper, and the exterior sheetrock wall. Air samples were also taken from inside Plaintiff's office and outside the building. The analysis of the samples indicates that stachybotrys spores "were present in high concentrations" inside Plaintiff's office. Penicillium and aspergillus were present inside as

well. A report from testing done on Plaintiff's home revealed the presence of some mold spores, but not at unusual or elevated levels.[2]

Defendants contend that there is no competent evidence that the mold escaped the wall cavity or that Plaintiff breathed the mold. However, Mr. Shrimanker testified that mold spores are blown through the air conditioning and heating vents and escape through the space surrounding electrical outlets, network cables, and drop ceilings. Photographs show mold on the electrical receptacles in Plaintiff's office. Furthermore Mr. Shrimanker testified that the carpet was contributing to the mold found in Plaintiff's office and recommended that the carpet be replaced during remediation. Although Mr. Shrimanker did not test the carpet to determine if mold was present under the carpet, he testified that, based on his observations and experience, there should have been. Mr. Shrimanker also testified that the day the carpet was pulled up to be replaced, he observed that the carpet was " 'full of mold.' " After the carpet had been removed, tape samples showed stachybotrys still on the floor. Furthermore, Mr. Shrimanker testified that when dry, moldy carpet is walked on or disturbed in some other manner, the mold spores can get released into the air.

Defendants argue that Mr. Shrimanker's testimony was "[in]competent evidence of an occupational exposure to mold" as he did not test the carpet to determine if it contained mold or what kinds of mold were present. However, Mr. Shrimanker testified that he observed mold on the carpet and acknowledged that identifying mold is "what [he] do[es] for a living[.]" Furthermore, the tape and air samples taken from Plaintiff's office identified that stachybotrys, penicillium, and aspergillus were present in Plaintiff's office.

Mr. Shrimanker testified that the general public is not exposed to stachybotrys under normal circumstances. He explained that stachybotrys is not found outdoors and is only found indoors when there has been water intrusion and there is an organic material such as paper or cellulose present upon which the mold can thrive. Mr. Shrimanker further testified that stachybotrys, or black mold, is the most dangerous kind of mold and that the presence of aspergillus and penicillium in addition to stachybotrys is like adding "insult to an injury" in that aspergillus and penicillium make the illness from

2. Although Defendants assert that the Commission's finding that "testing showed no mold in [P]laintiff's house" is not supported by competent evidence, the Commission did not make such a finding. The Commission found that "no *unusual* or *elevated levels* of mold" were present in Plaintiff's house. (Emphasis added.)

stachybotrys exposure worse. Mr. Shrimanker's report indicates that stachybotrys may produce mycotoxins such as sutratoxin "which is poisonous by inhalation." Penicillium can cause extrinsic asthma and some species can produce mycotoxins. Aspergillus can also produce mycotoxins.

Based on his experience, it was Mr. Shrimanker's opinion that Plaintiff's symptoms, including the reaction in his lungs, cough, fever, and burning eyes, were consistent with long-term exposure to stachybotrys, aspergillus, and penicillium.

Notwithstanding this testimony, Defendants further argue that the air samples taken on 27 August 2003 did not reflect the air quality Plaintiff breathed. While Mr. Shrimanker testified that on any given day, depending on the conditions, an air sample can reveal differing levels of mold in the same room, he further explained that any level of stachybotrys, whether it be on a tape sample or in the air, in an indoor facility is cause for concern as an individual should not be exposed to stachybotrys to any degree. Furthermore, "[o]ur Supreme Court rejected the requirement that an employee quantify the degree of exposure to the harmful agent during his employment." *Matthews v. City of Raleigh*, 160 N.C. App. 597, 606, 586 S.E.2d 829, 837 (2003) (quotation marks and citations omitted).

We conclude that the foregoing testimony is competent to support the challenged findings of fact regarding Plaintiff's occupational mold exposure. Thus, the assignments of error upon which Defendants' argument is based are overruled.

## C. Lien on Third-Party Settlement Proceeds

[5] Defendants finally argue that, pursuant to N.C. Gen. Stat. § 97-10.2, they are entitled to a lien against third-party settlement proceeds received by Plaintiff. Plaintiff responds that Defendants failed to offer evidence at the hearing on the issue of a lien, and, thus, have waived any right to pursue a lien. However, the parties stipulated to the following:

Defendants' issues to be addressed by the Commission are:

. . . .

e. If [P]laintiff's claim is compensable, have third-party settlement proceeds been distributed, to whom were they distributed, and, pursuant to N.C. Gen. Stat. § 97-10.2(h), may

any resulting lien be enforced against persons receiving such funds[.]

Furthermore, the record contains a "Settlement Agreement and Release of Claims" wherein

> Steve Jones Auto Group, Inc. d/b/a Steve Jones Honda, Steven R. Jones, and Sherrie L. Jones (collectively referred to as "Plaintiffs"), Myrick Construction, Inc. ("Myrick"), Commercial Acoustical and Drywall, Inc. ("CAD"), and Rockingham Paint and Glass Center, Inc. ("RPGC")

entered into a settlement agreement for claims arising out of "defects in the construction and renovation of the Steve Jones Honda dealership" providing for the payment of $1,000,000 to Plaintiffs. Pursuant to that agreement,

> Steven R. Jones agrees that any government or private liens, claims or demands for workers' compensation liens and/or medical expenses and services, and/or any unpaid bills owed for medical related services rendered to him prior to the date of this Agreement, will be paid from the sum he is to receive pursuant to this settlement agreement prior to distribution to him.

We conclude that Defendants have not waived their right to pursue a lien against such third-party settlement proceeds.

An injured employee has the exclusive right to enforce the liability of a third party within the first twelve months following an injury. N.C. Gen. Stat. § 97-10.2(b) (2007). Pursuant to subsection (h) of section 97-10.2, "[i]n any proceeding against or settlement with the third party, every party to the claim for compensation shall have a lien to the extent of his interest . . . upon any payment made by the third party by reason of such injury or death." N.C. Gen. Stat. § 97-10.2(h) (2007). This lien "may be enforced against any person receiving such funds[,]" *id.*, is a lien against "all amounts paid or to be paid" to the employee, *Hieb v. Lowery*, 344 N.C. 403, 408, 474 S.E.2d 323, 326 (1996) (emphasis removed), and is mandatory in nature. *Radzisz v. Harley Davidson of Metrolina, Inc.*, 346 N.C. 84, 90, 484 S.E.2d 566, 569 (1997).

Here, the Commission failed to determine whether third-party settlement proceeds had been distributed; if so, to whom they were distributed; and whether Defendants were entitled to a lien on those funds under N.C. Gen. Stat. § 97-10.2. Accordingly, we remand this

**IN RE M.L.T.H.**

[200 N.C. App. 476 (2009)]

case to the Commission to address and resolve the lien issue raised by Defendants.

AFFIRMED in part and REMANDED in part with instructions.

Chief Judge MARTIN and Judge HUNTER, JR. concur.